JUDGE TORRES

**13 CIV 5105**

C. Leonard Gordon, *pro se*, Margot Gordon *pro se*, and Steven J. Evans *pro se*
1400 Fifth Avenue,
New York, NY 10026
917 538 1173

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

C. LEONARD GORDON, MARGOT GORDON and STEVEM J. EVANS
Plaintiffs

Against

RAMOT-AT-TEL-AVIV-UNIVERSITY, ZE'EV WEINFELD, GIORA YARON, ZVI GALIL and GIDEON SCHICHMAN Defendants

JURY TRIAL DEMAND

(FILED 13 JUL 23 AM 10:44 U.S. DISTRICT COURT S.D. OF N.Y.)

---

**TABLE OF CONTENTS**
I. THE PARTIES
II. BASIS OF THE CAUSE OF ACTION
III. JURISDICTION AND VENUE
IV. JUDGEMENT DEMANDS: INJUNCTIVE RELIEF AND DAMAGES

## I. THE PARTIES

C. Leonard Gordon, ("**Gordon**") and his wife, Margot Gordon and Steven J. Evans (**Evans**); collectively the "**Plaintiffs**") are, collectively, the largest investors in dollar amount of the sixteen individuals who on October 8, 2006 purchased a $1.5 million of Preferred Shares of Althera Medical Ltd. ("**Althera**"). The Plaintiffs are also the largest investors in dollar amount in the more than $4 million of Senior Convertible Debt of Althera (the "**Convertible Debt**") commencing in the third quarter of 2007 and still being purchased by the Plaintiffs to keep Althera going while its ability to finance has been stopped by Ramot's notice of default and lawsuit in Tel Aviv seeking to terminate the Research and License Agreement dated as of September 13, 2005 between Ramot and Althera (the "**Patent Sublicense**") that Althera's business is based upon.

At a meeting held on May 4, 2013 the investors in Althera in Preferred Shares and Convertible Debt, (collectively the "**Investors**") voted in favor of bringing this lawsuit. Evans is former chief of electro-cardiology at Beth Israel Hospital, N.Y. and co-inventor and former CEO of Imacor Inc., a successful medical device that is improving the way cardiac patients in intensive care are being treated. Evans has since the summer of 2007 been President and CEO of Althera.

1

Gordon is a graduate of NYU law school, class of '55. He practiced law in New York full time, specializing in corporate and securities act law in New York until 1981 when he began investing in and leading developmental medical companies through regulatory approval and to market. He has since the summer of 2007 been Vice President, Business & Legal and subsequently Chairman of the Board of Althera. Margot Gordon, an art dealer specializing in master drawings and the founder of Master Drawing Week in the City of New York, is assisting Gordon in bringing this lawsuit *pro se* to reduce the cost of it.

Defendants are **1.** Ramot-at-Tel-Aviv-University ("**Ramot**"), an Israeli corporation, a wholly owned subsidiary of the business subsidiary of Tel Aviv University and the licensing arm for important intellectual property of the Tel Aviv University, (the "**University**"); **2.** Zvi Galil, former President of the University; ("**Galil**"); **3.** Ze'ev Weinfeld, former CEO of Ramot ("**Weinfeld**"); **4.** Gideon Shichman, former CEO of Ramot ("**Shichman**"); and **5.** Giora Yoran, Chairman of the Board of Ramot ("**Yoran**") (Collectively, the "**Defendants**")

## II. BASIS OF THE CAUSE OF ACTION

The basis of the cause of action is the willful and flagrant fraud committed by Ramot, aided and abetted by the other defendants, in breach of disclosure requirements of U.S. and New York securities laws; and, as part of the fraud; and, in furtherance of the fraud, and aided and abetted by the other defendants, Ramot's the tortious interference in the business of Althera to prevent it from producing its device, called "DaRTs™, or initiating its crucial First-in-Human Study. The result has been more than five years of delay in bringing Althera's cancer therapy through regulatory approval and to market for cancer patients who need it.

1. The fraud is ongoing today in a baseless lawsuit by Ramot in a Tel Aviv court seeking to terminate Althera's patent sublicense granted in the Research and License Agreement dated as of September 13, 2005 (hereinafter referred to as the "**Patent License**") and further delay in delivery of Althera's life saving, pain relieving cancer therapy to millions of cancer patients beyond the six years of delay already cause by the Defendants. If Ramot were to win its case in the Tel Aviv court, the result would bankrupt Althera, damage the University and add more years of delay in delivery of Althera's cancer therapy to patients who need it.
2. Ramot, by email dated January 8, 2012 from Ramot's CEO, Defendant Ze'ev Weinfeld ("**Weinfeld**"), gave notice to Althera of an alleged default by Althera based on an alleged Exhibit 1.3 of the Patent Sublicense. **The email stated that the default had occurred five years earlier in the first quarter of 2007!** Prior to the email Plaintiffs and the Investors had never heard of Exhibit 1.3 or of an alleged, five year old default in the Patent license.
3. Ramot was in control of the Board of Althera until Althera was rendered insolvent by Ramot who willfully responsible for the insolvency. Ramot gave up control of the Board after it caused the insolvency and was responsible for and in control of the fraud at all times before and after the insolvency, and remains in control of the fraud with its lawsuit in Tel Aviv.
4. The alleged Exhibit 1.3 provided that Althera had a Developmental Milestone to initiate an FDA Phase 1 Study in Q1 of 2007 *"unless the FDA would process Althera's device in the FDA's Pharmaceutical division, in which event there would be no such*

2

*Mandatory Milestone and Althera would have good faith discussions about how much more time would be required for this".*

5. The effect of the italicized phrase is that there was no default Q1 of 2007 or at any time thereafter and the five year late notice of default and the lawsuit to terminate Althera's patent license has no basis. At Althera's first and only meeting with the FDA soon after Q1 of 2007, the FDA stated that it would probably process Althera's device in its Pharmaceutical division as well as its Device division. This fact is verified by contemporaneous notes of said meeting. Ramot was well aware of the meeting with the FDA, but it made no inquiry of the FDA or Althera about the FDA's position on processing Althera's device. Weinfeld rushed to deliver the devastating Notice of Default on January 8, 2012, after it learned that Althera was low on funds, but was positioned to get its First-in Human Studies initiated as shown in Althera's first Press release in November of 2012 attached hereto as Exhibit A.
6. The Patent License provided that Ramot should deliver a notice of a default to Althera and give it three months to cure the default, after which Ramot had the right to terminate the Patent License. The five year delay in Ramot's complying with the notice requirement of the Patent License is proof of Ramot's fraudulent intent. During those five years the Investors invested millions of dollars in Althera, much of which went to the University.
7. Section 1.4 was entitled *"Development Milestones"* and states *"Development Milestones shall mean the development milestones set forth in Exhibit 1.4 hereto"*. Exhibit 1.4 is a headnote only and does not set forth any developmental milestones. This meant that there were no Developmental Milestones. Section 1.3 of the Patent License is entitled "Competing Product". It does not refer to an Exhibit 1.3. Exhibit 1.3 did not state that a failure to comply with the developmental milestones would be an event of default, and the Default Clauses of the Patent License do not refer to Exhibit 1.3 or to any Developmental Milestones. Ramot has advised the Tel Aviv Court that Exhibit 1.3 is an "obvious typo" that the court could and should correct. That request comes eight years after the typo was created by Ramot and all of the Investors reviewed an uncorrected Patent License. The typo was obvious if it was seen, but none of the three sets of lawyers, executives, secretaries, and three boards of directors who negotiated, drafted, approved and executed the Patent License in 2005 saw it because if they had seen it they would have corrected it because it was obvious.
8. Ramot had a statutory obligation to disclose material facts to the Investors. The Investors did not have a statutory obligation of "due diligence" and there were no brokers involved in their investments who had an obligation of due diligence.
9. Ramot has a Mandate from its parent company, the University, to commercialize the University's important intellectual property "for the benefit of mankind" and to provide royalties to the University for more research and to do so as rapidly as possible "because patents have a limited life." The University and Althera will benefit greatly from an early settlement of this matter, which is likely, but we have been advised that this lawsuit must be filed first.

There are a number of other bases for the cause of action, but the definitive cause of action set forth above is sufficient.

## IV. Jurisdiction and Venue.

3

Jurisdiction is based on diversity. Except for Professor John Brown, ("**Professor Brown**") all of the Plaintiffs and Investors are citizens and residents of the United States with the majority in New York, and all of the Defendants are citizens and residents of Israel.

Venue is clearly New York. Ramot created the fraud upon New York Investors and profited from their investment in Althera. The Investors had also threatened to add Althera as a defendant in this action and Althera has agreed to avoid it with a settlement of the Investors' claim.by paying a royalty to the investors when as and if Althera is marketing its cancer therapy, and, as part of the settlement, Althera will has agreed to counterclaim against Ramot in the case in Tel Aviv seeking damages.

Jurisdiction is also based upon the Securities and Exchange Act of 15 U.S.C. 77 and the Securities and Exchange Act of 1934, and Rule 10b 5 promulgated by the Securities and Exchange commission.

Ramot, at all times was a corporation with no presence in the U.S, and was responsible for the fraud that is the basis of this cause of action.

Section 15 of the 1933 Act and Section 20(a) of the 1934 Act established that the "controlling person" of the entity responsible for the primary securities violation would be secondarily liable 17 C.F.R. § 240.10b-5 **(1992).** Rule **10b-5** prohibits any person participating in a securities transaction from "employ[ing] any device, scheme, or artifice to defraud...or] engaging in any act, practice, or course of business which operates or would operate as a fraud."

More than $75,000 in damages is involved.

Venue is proper in New York pursuant to 28 U.S.C. Section 1332

The full impact of the conduct of Defendants was on the investment of all of the Investors who are all US citizens and residents except Professor Brown who is a citizen of England.

### V. JUDGEMENT DEMANDS: INJUNCTIVE RELIEF AND DAMAGES

The above described fraud; tortious interference in Althera's business and more than five years of delay in delivery of Althera's cancer therapy has caused substantial damage to the Plaintiffs and the Investors. The notice of default was intended to put Ramot out of business, and it would have if: Evans, and Gordon, working without pay, had ceased to be CEO and VP Business & Legal; Gordon and Margot had not continued to invest in Althera; Professor Brown, Gordon's and Evans's scientific advisor, had not continued to be a Director of and advisor to Althera; and key employees had not agreed to continue to consult and to try to remain ready to return as employees of Althera as soon as the Defendants abandoned their fraudulent actions against Althera.

The damage caused by the Defendants was marked by the following events.

1. Gordon and Evans learned at their first meeting of Althera's Board that Shichman was not qualified to lead Althera through regulatory approval and that additional funding of Althera was required. Professor Brown brought Althera an offer of a $10 million financing from a prestigious Chinese group. Gordon advised the Board that Althera would become insolvent without the financing but the offer was rejected because it required a new CEO satisfactory to the Chinese group. The swing vote against the financing was that of Ramot's designee to the Board.
2. Two months later, Althera was rendered insolvent; Shichman was fired for cause; Ramot's designee to Althera's Board resigned; Professors Brown was elected to replace him, and Evans became CEO and Gordon became VP Business & Legal of Althera.

4

They then devoted their business life to Althera from 2007, Gordon without any salary and Evans without most of his. They would not have done this if they knew that Ramot had a claim that that Althera was in default of its Patent License that Ramot failed to disclose until 2012.

3. Their first job was to refinance Althera with a Senior Convertible Debt offering which was soon sufficient to commence the crucial First-in-Human Study. Former President of the University Galil, for no good reason and in collusion with Weinfeld prevented commencement of s First-in-Human Study by not allowing the manufacture of DaRTs™ for the First-in-Human Study at Tel Aviv University where Shichman was manufacturing them. His adverse action was reversed by President Klafter when he replaced Galil two years later, but it was too late for the First-in-Human Study. Galil's action added two years to Althera's time line and drained Althera's cash.

4. Professor Brown arranged a second financing from the Chinese group, but when Evans, Gordon and Professor Brown arrived in Hong Kong to proceed with financing they found that that Lehman Brothers had collapsed, the market and had crashed, and the Chinese group had to buy back $1.5 billion of Lehman Brothers and AIG bonds and could not consider an equity financing.

The damage to Althera of five years of delay will be shown to exceed $100 million. The Plaintiffs intend to limit their demand for damages to $35 million, based their estimate that amount will be necessary to finance Althera to market.

The wife of one of the Investors has just been diagnosed with liver cancer. He may be considering a claim of special damages.

Plaintiffs will also seek injunctive relief to terminate Ramot's claim of a default in the Patent License and its legal action in Tel Aviv.

Respectfully submitted,

_____   _____   _____
C. Leonard Gordon, *pro se*   Margot Gordon, *pro se*   Steven J. Evans M.D, *pro se*

## Exhibit A

## Press Release 11/7/11

## Major Israeli Institution Selected to Lead Human Clinical Trials for Revolutionary Alpha Radiation Cancer Therapy.

Althera Medical Ltd. announced today that it intends to perform a First-in-Human study for its revolutionary treatment of malignant tumors with alpha radiation at Israel's eminent Rabin Medical Institute. Professors Benjamin Corn, M.D., Chairman of Radiation Oncology at the Sourasky Medical Center and Althera's

Chief Medical Officer, and Aron Popovtzer, M.D., Chief of the Head and Neck Tumor Service at Rabin's Beilinson Hospital will lead the study.

Althera's alpha radiation delivery system is expected to offer hope to patients suffering from head and neck, colon, pancreatic, sarcoma, brain, melanoma and lung cancer. Althera's Chairman, C. Leonard Gordon, a lawyer and entrepreneur with previous in-depth experience in successfully bringing medical devices through the FDA approval process and to market, believes that Althera's technology could be made available to these patients rapidly under the FDA's Compassionate Use policy.

Professor Michael J. Zelefsky, Chief of Memorial Sloan Kettering's Brachytherapy Service, said "the advantages of alpha over beta and gamma radiation are expected to be shown in these studies. Althera's unique method of alpha radiation delivery is expected to minimize side effects."

John Brown MD advises that preclinical studies at Tel Aviv University are "Proof of Principle" that DaRTS™ will work on tumors in the Althera's human clinical studies. Dr. Brown is currently Head of Global Strategic Drug Development & Alliances, Quintiles PLC. He has served as Global V.P. and in Experimental and Translational Medicine areas for SmithKlein Beacham. Dr. Brown has served as an advisor and a Director of Althera since 2007.

Althera's therapy delivers alpha radiation using tiny needles called D$\alpha$RT™ (*D*iffusing *A*lpha-emitters *R*adiation *T*herapy) invented by Professor Itzhak Kelson of Tel Aviv University.



**CHARTS FROM ANIMAL STUDIES AT TEL AVIV UNIVERSITY LABORATORIES**



Dr. Steven Evans, CEO of Althera Medical, stated that alpha radiation has been the 'holy grail' of radiation therapy for more than 50 years, but wasn't used because it couldn't be delivered. DaRTS$^{TM}$ solved this problem. After they are injected into tumors and begin to generate alpha radiation that diffuses radiation throughout the tumor, killing cancer cells and shrinking or destroys the tumor.

Althera is now moving to regulatory approval for human use on recurrent head & neck cancer. The National Cancer Institute estimates that $3.1 billion is spent on head and neck cancer annually. In addition to head & neck cancer, Althera will move as soon as possible to treat recurrent head & neck, colon, pancreatic, sarcoma, brain and lung cancers. These are today's unmet needs that could be treated soon under the FDA Compassionate Use Policy that is typically approved for individual patients prior to a regular FDA approval.

The end point of the First-in-Human clinical study is safety, with secondary endpoints of tumor reduction and relief of pain. The study may require as few as 15 patients and is a prerequisite to larger FDA and European regulatory studies and Compassionate Use treatments.

Dr. Evans stated that DaRTS™ will be much less expensive and easier to administer than beta or gamma radiation. DaRTS™ do not require heavy equipment, specially shielded rooms or lead vests, and the entire dosage can be delivered in a single session. Also, Alpha radiation breaks the double strand of DNA of the cancer cells, hindering cancer cells from repairing themselves and thereby reducing the possibility of radiation-resistance in tumors. Radiation, he noted, is a big market that is currently used in about 50% of all tumor therapies.

The First-in-Human Study is expected to start in a few months if not delayed by financing which has been difficult in the face of the recession. It is expected that financing will be successful now that there is proof of principal that DaRTS™ do work on human tumors and are so close to human clinical studies.

Althera Medical is an Israeli Company with its headquarters co-located in New York City's Harlem and in Tel Aviv. Its Advisory Board contains eminent Interventional Radiologists, Brachytherapists and Radiation Oncologists at Memorial Sloan Kettering, Johns Hopkins, and at major hospitals in Israel and Europe.

**Questions should be addressed to C. Leonard Gordon at 212-289-7040 or 917-538- 1173 or leonard.gordon@altheramedical.com**

## Medical Advisory Board

**_Michael Zelefsky, M.D.:_**
Chief, Brachytherapy, Memorial Sloan Kettering Cancer Center

**_David Sidransky, M.D.:_**

8

Director, Head and Neck Cancer Research, Johns Hopkins University Hospital

**_Marco Zaider, Ph.D.:_**
Head of Brachytherapy Physics, Memorial Sloan Kettering Cancer Center

**_Jean Claude Horiot, M.D., Ph.D.:_**
Director of the Cancer Institute G.F. Leclerc, Dijon, France

**_Abraham Kuten, M.D.:_**
Director Radiation and Medical Oncology, Rambam Medical Center, Israel

**_Stephen Solomon, M.D.:_**
Chief, Interventional Radiology, Memorial Sloan Kettering Cancer Center

## Peer Reviewed Scientific Publications

*The treatment of solid tumors by alpha emitters released from (224)Ra-loaded sources-internal dosimetry analysis. Arazi L, Cooks T, Schmidt M, Keisari Y, Kelson Phys Med Biol. 2010 Feb 21;55(4):1203-18*

*Local control of lung derived tumors by diffusing alpha-emitting atoms released from intratumoral wires loaded with radium-224. Cooks T, Schmidt M, Bittan H, Lazarov E, Arazi L, Kelson I, Keisari Y.*
*Int J Radiat Oncol Biol Phys. 2009 Jul 1;74(3):966-73.*

*Interstitial wires releasing diffusing alpha emitters combined with chemotherapy improved local tumor control and survival in squamous cell carcinoma-bearing mice. Cooks T, Arazi L, Efrati M, Schmidt M, Marshak G, Kelson I, Keisari Y. Cancer. 2009 Apr 15;115(8):1791-801.*

*Growth retardation and destruction of experimental squamous cell carcinoma by interstitial radioactive wires releasing diffusing alpha-emitting atoms. Cooks T, Arazi L, Schmidt M, Marshak G, Kelson I, Keisari Y.*

*Int J Cancer. 2008 Apr 1;122(7):1657-64.*

*Treatment of solid tumors by interstitial release of recoiling short-lived alpha emitters. Arazi L, Cooks T, Schmidt M, Keisari Y, Kelson I.*
*Phys Med Biol. 2007 Aug 21;52(16):5025-42.*